**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Neil Miller, | ) | |
| | ) | **ORDER DENYING** |
| Plaintiff, | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| Equinor Energy LP, | ) | Case No. 1:21-cv-176 |
| | ) | |
| Defendant. | ) | |

_____

Before the Court is the Defendant's motion for summary judgment filed on December 6, 2022.  <u>See</u> Doc. No. 21.  The Plaintiff filed a response in opposition to the motion on December 23, 2022.  <u>See</u> Doc. No. 24.  The Defendant filed a reply brief on January 17, 2023.  <u>See</u> Doc. No. 28. For the reasons set forth below, the Defendant's motion for summary judgment is denied.


I.      **BACKGROUND**

Equinor Energy LP ("Equinor") is an oil and gas production company which previously operated in North Dakota.  In 2015, Equinor (then known as Statoil Oil & Gas LP) hired MLB Consulting ("MLB") to provide, among other things, pumper services for wellsites in the Bakken oil field in western North Dakota.  Equinor and/or MLB (who hired Miller is disputed) hired Miller to work as a lease operator, also referred to as a pumper.  As a lease operator, Miller was responsible for operating and maintaining oil wells, including gauging tanks, reading meters, maintaining equipment, checking for leaks, monitoring alarms, completing paperwork, making sure everything was running properly on location and visiting each of the five to seven wellsites on his route once or twice each day.  Miller usually worked alone.

On November 8, 2018, Miller was working as a lease operator at an Equinor wellsite known as the Judy Irgens 3 ("Wellsite") when he noticed oil leaking out of the Lease Automatic Custody Transfer ("LACT") building. Between 44 and 176 barrels of oil leaked onto the well pad from the LACT building. The LACT building consisted of two rooms: the larger room held several pumps and metering and testing equipment called the pump room. The second room, called the control room, was much smaller and housed the electrical controls for the equipment in the pump room. The wall between the two rooms contained a vapor barrier, which was designed and intended to prevent the migration of gases from the pump room into the control room where electrical equipment could ignite the gases.

When Miller opened the door to the control room he noticed there was no spilled oil in the room and his gas monitor did not indicate any explosive levels of gas in the room. Needing to stop the pumps from spilling oil, Miller entered the LACT building's control room to push the shutdown button and stop the leak. Miller understood that the control room of the LACT luilding was sealed off from the pump room so that he could operate the electric control panel in a room that was free of explosive gases. When Miller touched the buttons on the control panel to shut down the LACT pumps, gases that had migrated through the faulty vapor barrier ignited, burning his hair, hands, face, and lungs. Miller was then able to exit the control room, push the emergency stop button for the pumping units on the wellsite, and drive his truck away from the wellsite in order to get help for his injuries.

The explosion occurred because the vapor barrier between the pump room and control room was compromised. This allowed vapors from the oil leak to migrate through the faulty vapor barrier into the control room and control box. When Miller opened the door to the control room, the

2

accumulated vapors in the room escaped into the atmosphere, but the vapors in the control box did not. Because the vapors had escaped into the atmosphere, Miller's gas monitor did not go off upon entering the room. The explosion was limited to the control box and did not consume the entire room because most of the vapors, save for those in the control box, had escaped. After the incident, Equinor undertook to repair faulty vapor barriers on its wellsites.

III.   **LEGAL DISCUSSION**

Miller filed this action in federal court on September 13, 2021, alleging claims for negligence and vicarious liability. Miller alleges that Equinor, as the owner and lease operator of the wellsite, breached its duty to operate and maintain the premises in order to provide Miller with safe working conditions at the wellsite. Equinor has moved for summary judgment contending that Miller was the employee of an independent contractor hired by Equinor and, as such, Equinor did not owe a not duty to Miller. Miller contends Equinor retained control of the wellsite and owed him a duty to maintain a safe premises.

Because the jurisdictional basis for this action is based on diversity of citizenship, the Court must apply the substantive law of North Dakota. See Atkinson v. McLaughlin, 462 F. Supp. 2d 1038, 1047 (D.N.D. 2006). Under North Dakota law,

> Actionable negligence consists of a duty, breach, and an injury that was proximately caused by the breach. Negligence actions are generally not appropriate for summary judgment because they involve issues of fact. However, the existence of a duty is usually a preliminary question of law, unless it depends on the facts that must be determined by the factfinder.

See Iglehart v. Iglehart, 670 N.W.2d 343, 347-48 (N.D. 2003) (internal citations omitted).

Equinor alleges it did not owe any duty to Miller because he was employed by an

3

independent contractor (MLB) hired to work at the well site and Equinor had no control over those operations.  Generally, an employer is not liable for the tortious misconduct of its independent contractor.  Grewal v. North Dakota Ass'n of Counties, 670 N.W.2d 336, 339 (N.D. 2003).  However, North Dakota has adopted the Restatement (Second) of Torts, Section 414, which recognizes an exception to the general rule of employer non-liability.  Id.  This exception makes an employer liable for the acts of an independent contractor when the employer has retained sufficient control over the work.  Kronberg v. Oasis Petroleum North America LLC, 831 F.3d 1043, 1049 (8th Cir. 2016).

The Supreme Court of North Dakota held that the "liability created by Section 414 arises only when the employer retains the right to control the method, manner, and operative detail of the work; it is not enough that the employer merely retains the right to inspect the work or to make suggestions which need not be followed."  Fleck v. ANG Coal Gasification Co., 522 N.W.2d 445, 448 (N.D. 1994).  The Court explained that "[c]omment c to Section 414 explains the difference," citing:

> In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done.  It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.  Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail.  There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

Fleck, 522 N.W.2d at 448.

In addition, under North Dakota "premises liability law, landowners owe a general duty to lawful entrants to maintain their property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to another, the seriousness of the injury, and the

4

burden of avoiding the risk." <u>Groleau v. Bjornson Oil Co., Inc.</u>, 676 N.W.2d 763, 769 (N.D. 2004)

(citing cases and Restatement (Second) of Torts § 343).  Section 343 of the Restatements provides:

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

Restatement (Second) of Torts § 343.

Further, the invitee is afforded the following care:

> is entitled to expect such care not only in the original construction of the premises, and any activities of the possessor or his employees which may affect their condition, but also in inspection to discover their actual condition and any latent defects, followed by such repair, safeguards, or warning as may be reasonably necessary for his protection under the circumstances.

Restatement (Second) of Torts § 343 (comment b).

The "defendant must have had control over the property where the injury occurred in order to find the defendant owed a duty to an injured party." <u>Saltsman v. Sharp</u>, 803 N.W.2d 553, 559 (N.D. 2011).  Whether or not a duty exists is generally a preliminary question of law for the court. <u>Barsness v. General Diesel & Equipment Co.</u>, 383 N.W.2d 840, 843 (N.D. 1986).  However, if the existence of a duty depends upon factual determinations, those determinations are for the trier of fact.  <u>Id.</u>; <u>see also</u> <u>Madler v. McKenzie Cnty.</u>, 467 N.W.2d 709, 711 (N.D. 1991)

In this case, whether Equinor had a duty to Miller depends on the extent of its control over the wellsite and over Miller himself.  What degree of control Equinor exercised over the well site

and whether it was sufficient to warrant a duty to Miller is a question of fact unless reasonable persons could reach only one conclusion. See Gullickson v. Torkelson Bros., 598 N.W.2d 503, 505 (N.D. 1999) ("If the existence of a duty depends upon factual determinations, the facts must be determined by the fact finder. Issues of fact, however, may become issues of law for the court, if reasonable persons could reach only one conclusion from the facts."). In addition, the North Dakota Supreme Court has repeatedly warned against granting summary judgment in cases such as this:

> We have often stated that negligence actions ordinarily should not be disposed of by summary judgment. Even if there is no dispute as to the evidentiary facts, if there is any doubt as to the existence of a genuine issue of material fact, or if differing inferences can be drawn from the undisputed evidence, there is a jury question and summary judgment is improper where questions of negligence are in issue. Where there exists the slightest doubt as to a factual dispute or genuine issue of fact, summary judgment should be denied in a negligence action.

Barsness, 383 N.W.2d at 844 (internal citations and quotations omitted).

The Court finds reasonable persons could reach differing conclusions regarding whether Equinor retained and exercised control over Miller and the LACT building. The record clearly establishes the existence of genuine and material issues of fact in dispute, specifically regarding the extent of Equinor's retained control over the wellsite, the LACT building, and Miller's work. Miller points to evidence throughout the record demonstrating that he was not entirely free to do the work in his own way, and that Equinor exercised more than "some degree of control" over the "methods, manner, or operative detail" of his work.

As an example of some of the many genuine issues of material fact in dispute are the following:

1. The report from the Plaintiff's expert concluded the incident "was entirely avoidable had Equinor provided a safe place to work, which Equinor failed to do," Equinor failed to maintain the

LACT building in a safe manner, and Miller cannot be faulted for entering the LACT building to shut down the pumps and stop the oil spill . See Doc. No. 24-1, pp. 24-25.

2.  It is undisputed Equinor owned and operated the wellsite and LACT building.

3.  Equinor created and gave Miller a book of twenty-six (26) detailed SOPs that Miller was required to follow. See Doc. No. 24-4, ¶ 14,

4.  Miller was trained by Equinor, not MLB.  MLB did not provide any supervision or oversight of Miller, this was done solely by Equinor.  See Doc. No. 24-8,  pp. 45-46, 48-49,

5.  Equinor could terminate Miller if he did not perform his work as expected and instructed by Equinor.  See Doc. No. 24-4, ¶ 13

6.  MLB had no control over anything regarding Miller's work for Equinor; all it did was process paychecks from Equinor to Miller.  See Doc. No. 24-4, ¶¶ 5-9.

7.  Miller was hired by Equinor, worked exclusively at Equinor locations and under the direction of Equinor supervisors.  Miller was trained by his Equinor supervisor, John LaDue. Equinor directed and controlled every aspect of his job.  See Doc. No. 24-4, pp. 2-8.

8.  Equinor was aware of safety issues related to the faulty vapor barriers in its LACT buildings which allowed gases to migrate between the pump room and the control room before the incident which injured Miller occurred.  See Doc. No. 24–2, p. 31.

Miller has presented more than sufficient evidence, which must be viewed in a light most favorable to Miller, that Equinor retained and exercised sufficient control over him and particularly over the LACT building on the wellsite.  The record is replete with genuine issues of material fact concerning Equinor's control.  Whether Equinor retained sufficient control over the operations to trigger a duty to Miller is a genuine issue of material fact which precludes the Court from ruling as

a matter of law.  Because the existence of a duty in this case depends on a multitude of factual determinations, those facts must be determined by the jury.  <u>Barsness</u>, 383 N.W.2d at 844.  In addition, there are genuine issues of material fact in dispute concerning the premises liability claim and Equinor's responsibilities for the safety of the LACT building which they owned.  Therefore, summary judgment is inappropriate.


IV.   **<u>CONCLUSION</u>**

The Court has carefully reviewed the record, the parties' briefs, and the relevant case law. For the reasons set forth above, the Defendant's motion for summary judgment (Doc. No. 21) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 12th day of April, 2023.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court